## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

LEQUESHA C.,[1]

    Plaintiff,

v.

KILOLO KIJAKAZI,[2]
Acting Commissioner of Social Security,

    Defendant.

Case No. 20-cv-3581-RMM

## MEMORANDUM OPINION AND ORDER

Plaintiff Lequesha C. brought this action under a provision of the Social Security Act,

42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's decision to deny

her claim for Social Security Disability Insurance and Supplemental Security Income benefits.

With the parties' consent the matter was referred to the undersigned for all purposes.  *See* Sept.

20, 2020 Min. Order.  Now pending are Ms. C.'s Motion for Judgment of Reversal, ECF No. 16,

and the Commissioner's Motion for Judgment of Affirmance, ECF No. 17.  Having reviewed the

Administrative Record,[3] the parties' briefs,[4] and the relevant law, the Court grants Ms. C.'s

---

[1] Plaintiff's name has been partially redacted in keeping with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Mem. from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt., to Chief Judges of the U.S. Cts. of Appeals et al. (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf.

[2] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d) and the last sentence of 42 U.S.C. § 405(g), Ms. Kijakazi is substituted for Andrew Saul as the Defendant in this case.

[3] Page citations to the Administrative Record, ECF Nos. 12–13 ("AR"), refer to the running pagination at the lower right margin.

[4] The relevant briefs are Ms. C.'s Motion for Judgment of Reversal, ECF No. 16 ("Pl. Mem."); the Commissioner's Memorandum in Support of her Motion for Judgment of Affirmance and in Opposition to Ms. C.'s Motion, ECF No. 18 ("Def. Mem."); and Ms. C.'s Reply in Support of her Motion and in Opposition to the Commissioner's Motion, ECF No. 19.

Motion for Judgment of Reversal, denies the Commissioner's Motion for Judgment of Affirmance, and remands this matter to the Social Security Administration with instructions to calculate and enter an award of benefits, for the reasons that follow.

## BACKGROUND

Ms. C. applied for Social Security Disability Insurance and Supplemental Security Income benefits in November 2015, when she was thirty-six years old. AR 279–80, 283–90. Her disability claim is based on a combination of physical and mental impairments including depression, anxiety, post-traumatic stress disorder ("PTSD"), chronic back pain, headaches, asthma, insomnia, and urinary incontinence. *See* AR 251, 438–41. She initially alleged that her disability began in February 2015, but later amended her "onset date" to January 1, 2016. AR 43–44, 279. Prior to her onset date, Ms. C. worked as a care manager, retail associate, and certified nursing assistant. AR 328, 869. She has not worked since her amended onset date. *See* AR 19, 319. She lives in an apartment in Washington, D.C., with her two minor sons, both of whom are disabled. AR 54, 58.

Ms. C.'s application for benefits was denied at both the initial and reconsideration levels of review. AR 161, 167. She requested a hearing before an Administrative Law Judge ("ALJ"), which was held in August 2018. AR 48, 175. The ALJ also denied Ms. C.'s application for benefits. AR 149–50. Ms. C. then requested review by the Social Security Administration's Appeals Council. AR 223. The Appeals Council remanded her case to the ALJ in August 2019 to address two errors in the ALJ's initial decision: failure to evaluate the opinion of one of Ms. C.'s treating physicians, and failure to evaluate the severity of Ms. C.'s PTSD. AR 156, 158.

On remand, the ALJ again denied Ms. C.'s application for benefits. AR 12–32. The Appeals Council declined to review this revised decision. AR 1, 10. The ALJ's second decision therefore functions as the Commissioner's final decision, which Ms. C. has asked this Court to

reverse pursuant to 42 U.S.C. § 405(g).  *See* Pl. Mem. at 1.  The SSA filed a cross-motion asking

that the Court affirm the decision.  *See* Def. Mem. at 1.

## I.     Legal Framework

To qualify for benefits under the Social Security Act, a claimant must demonstrate a

disability that renders her unable to "engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment . . . which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(a), 423(d)(1)(A),

1382(a)(1), 1382c(a)(3)(A).  The Commissioner uses a five-step process to determine whether a

claimant is disabled under the Act.  20 C.F.R. §§ 404.1520, 416.920; *see also Butler v. Barnhart*,

353 F.3d 992, 997 (D.C. Cir. 2004) (describing each step).  At step one, the claimant must show

she is not engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step two, she must show she has a "severe medically determinable physical or mental

impairment" or combination of impairments.  *Id.*

At step three, the Commissioner must determine whether the claimant's impairment or

impairments meet or equal an entry in the Commissioner's Listings maintained at 20 C.F.R. part

404, subpart P, appendix 1.  The Listings describe impairments that the Commissioner considers

disabling without regard to a claimant's age, education, or work experience.  *See id.*

§§ 404.1520(d), 416.920(d).  Particularly relevant to this case, to meet or equal a Listing for a

mental health impairment, a claimant must satisfy the Listing's "Paragraph A" criteria and either

its "Paragraph B" or "Paragraph C" criteria.  *See id.* pt. 404, subpt. P, app. 1 § 12.00(A)(2).[5]  The

Paragraph A criteria describe medical evidence about the claimant's impairment(s) that must be

---

[5] Not every mental health Listing includes both Paragraph B and Paragraph C criteria.  To meet or equal a Listing without Paragraph C criteria, the claimant must satisfy both the "A" and "B" criteria.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A)(2).

present in the record. *Id.* § 12.00(A)(2)(a). The Paragraph B criteria measure the extent to which the claimant's impairment(s) limit her functionally. *Id.* § 12.00(A)(2)(b).[6] For listings that also include a Paragraph C, the criteria measure whether a mental disorder is "serious and persistent." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A)(2)(c). If both the Paragraph A and the Paragraph B or C criteria are satisfied for an entry in the Listings, the Commissioner will conclude that the individual is disabled and end her inquiry. *See id.* §§ 404.1520(a)(4), 416.920(a)(4).

A claimant may still be disabled if her impairments do not meet or equal a Listing. In that case, the Commissioner must next assess the claimant's residual functional capacity or "RFC." 20 C.F.R. §§ 404.1520(a)(4), (e), 416.920(a)(4), (e). Residual functional capacity measures what an individual "can do in a work setting" despite the person's physical and mental limitations. *Id.* §§ 404.1545(a)(1), 416.945(a)(1). The RFC is then used to determine, at step four, whether the claimant's impairments prevent her from performing "past relevant work," and at step five, whether the claimant can perform other work that exists in the national economy consistent with the claimant's age, education, and work experience. *Id.* §§ 404.1520(a)(4), 416.920(a)(4); *see also Butler*, 353 F.3d 997. If an individual's claim fails at either step four or step five, the Commissioner will conclude that the individual is not disabled and deny the claimant's benefits request. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

---

[6] At the time Ms. C. applied for benefits, the Commissioner measured four broad categories of functional limitations in Paragraph B (the "Pre-2017 Functional Areas"): (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *See id.* (version eff. Aug. 12, 2015 to May 23, 2016); 81 Fed. Reg. 66138, 66160 (Sept. 16, 2016). Beginning on January 17, 2017, the four broad categories of functional limitations (the "Post-2017 Functional Areas") became: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *See* 81 Fed. Reg. at 66160; 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## II.     Record Evidence

The evidence collected in support of Ms. C.'s disability claim shows that Ms. C. is a survivor of long years of physical, sexual, and domestic abuse.  *See* AR 337, 583, 586, 612, 616, 1162, 1851, 1890–91.  She was born and raised in Trinidad and Tobago, where she was abused by her mother and uncle.  AR 612, 1890.  She immigrated to the United States alone as a young teenager and lived with an aunt, who was also abusive and neglectful.  AR 612, 618, 1890.  As an adult, Ms. C. has been in three committed relationships "and has been physically and sexually abused in each one."  AR 612.  She was married for a time to the father of her fourth and youngest child.  AR 612, 1890.  She divorced him when she discovered he was sexually assaulting her daughters.  *Id*.

Despite these challenges, Ms. C. remained high functioning and was gainfully employed for many years.  *Id*.  That changed in September 2015, when her mental health and daily living capacities "regressed severely" due to psychological stress and suspected additional abuse.  AR 917; *see also* AR 588, 612, 902, 1851.  She has since been diagnosed with PTSD, major depressive disorder, and anxiety.  AR 334, 516, 621, 903.  She also experiences chronic pain, headaches, insomnia, and shortness of breath at least partially related to her trauma history and anxiety.  *See* AR 762, 1762 (back pain); AR 1205, 1821, 1869 (headaches); AR 612 (trouble sleeping); AR 1480, 1535 (shortness of breath).

### A.     Evidence Of Ms. C.'s Symptoms And Limitations

Ms. C.'s mental and physical health have vastly impacted her daily life.  She reports difficulty interacting with unfamiliar people or too many people at a time.  AR 1427, 1837; *see also* AR 354, 1311–12.  She is easily distressed outside her home, exhibiting anxiety and fear reactions to (among illustrative examples) slight or unexpected noises, encounters with strangers, reminders of abuse triggered by a receptionist's voice or the sight of her former abuser, and

changes in the décor or arrangement of her therapist's office. *See* AR 576, 1115, 1182, 1642, 1673, 1676, 1838. She attends regular therapy sessions, receives case management support, and takes numerous medications to control her nightmares, anxiety, and pain. *See, e.g.*, AR 615, 621, 867, 1426.

Ms. C. also requires assistance from others to complete a variety of everyday tasks. Home health aides help her care for her two disabled sons "every day," sometimes for eight hours a day "and sometimes longer." AR 59–60 ("they leave when they sleep"); *see also* AR 612 (doctor's note documenting "nurses assigned to help with the boys"); AR 62, 1182 (documenting assistance with caregiving from Ms. C.'s friend Bernard); *cf. also* AR 351 (explanation from Ms. C. that she "supervise[s] the children's personal care"). She does not drive or use regular public transportation, relying instead on Bernard or "Medical Transportation" to attend appointments and meetings or visit stores. AR 59, 61–63, 353, 524, 1804. Her therapist helps her review paperwork and schedule appointments. *See* AR 67, 1284, 1286, 1793. She relies on her support networks to communicate with medical providers and service agencies, as well. *See* AR 1676, 1692. Ms. C. can, however, independently prepare light meals such as frozen dinners, perform household chores including laundry and light cleaning, maintain her personal grooming, and perform occasional caregiving tasks for her sons. *See* AR 351–56, 524, 902.

### B.    *Physician Opinion Evidence*

The record also contains numerous assessments of Ms. C.'s limitations by her doctors. Among them is Dr. Spencer Ward, who began seeing Ms. C. for depression and insomnia in November 2015. *See* AR 612–15. Dr. Ward noted at the time that Ms. C. had "[s]evere anxiety with daily flashbacks to abuse"; "severe nightly nightmares"; and "[d]epression with loss of energy, daily crying, weight loss . . . , constant racing thoughts," and an inability to "talk to

people without crying." AR 612.  He also documented her complaints of back pain of "moderate

intensity" and inability to concentrate.  AR 615.  He expressed the opinion that Ms. C. had

"extreme" limitations in two of the Pre-2017 Functional Areas measured by the Commissioner:

her ability to function socially and to maintain concentration, persistence, or pace.  AR 335.  Dr.

Ward assessed that Ms. C. had "marked" limitations in the two other Pre-2017 Functional Areas:

activities of daily living and episodes of decompensation.  AR 335.

Ms. C. was also assessed the same month by Dr. Sylvia Rosario.  *See* AR 516–17.

Dr. Rosario diagnosed Ms. C. with major depressive disorder and PTSD due in part to "the

overwhelming stressors of her daily life, which prevent her from performing work outside the

home."  AR 516–17.  Dr. Rosario rated Ms. C.'s limitations as "marked" across all four of the

Commissioner's Pre-2017 Functional Areas.  *See id*.

The record also contains a report by Dr. Katherine Marshall Woods, who evaluated Ms.

C. as part of her initial disability determination in March 2016.  *See* AR 85, 521–25.  Dr. Woods

diagnosed Ms. C. with "[p]ersistent depressive disorder" and assessed her attention,

concentration, and memory as "mildly" impaired.  AR 523–24.  She rated Ms. C.'s ability to

understand and follow simple directions and instructions; perform simple tasks independently;

maintain a regular schedule; and learn new tasks as "mildly" impaired.  AR 91–92.  Dr. Woods

believed Ms. C. was "moderately impaired" in her ability to perform complex tasks

independently, relate adequately with others, and deal appropriately with stress.  *Id*.

Ms. C. was evaluated by another consultive examiner, Dr. Patricia Cott, in April 2016.

*See* AR 95.  Dr. Cott believed Ms. C. showed "moderate" limitations in three of the Pre-2017

Functional Areas measured by the Commissioner: activities of daily living; social functioning;

and maintaining concentration, persistence, and pace.  AR 94.  Dr. Cott also assessed that Ms. C.

had experienced "One or Two" extended episodes of decompensation.  *Id*.  She noted that Ms.

C.'s symptoms included "[s]ocial interaction limitations" and that Ms. C. "appear[ed] to retain

the ability to sustain CPP [concentration, persistence, and pace] for at least 2 hours[,] relate to

others[,] and adapt to the work setting."  AR 96.

Ms. C. was also evaluated by Dr. Fatima Noorani of the McClendon Center.  *See* AR

1426–27.  Dr. Noorani saw Ms. C. over the course of multiple appointments, coordinated Ms.

C.'s medications, and referred her to other specialists.  *See* AR 1677, 1810, 1869, 1890.  She

concluded in 2018 that Ms. C.'s PTSD and anxiety remained "significantly symptomatic" despite

treatment, and that Ms. C.'s "current anxiety [and] difficulty with attention, memory, and

executive functioning" were all "quite disabling."  AR 1426–27.  She assessed Ms. C.'s

limitation in social functioning as "extreme."  AR 1427.  She believed that Ms. C. demonstrated

"marked" limitations in the Commissioner's remaining three Pre-2017 Functional Areas.  *See id*.

Almost two years later, in February 2020, Dr. Noorani completed a second assessment of Ms. C.,

this time measuring her functional limitations using the Commissioner's Post-2017 Functional

Areas.  *See* AR 1899–901.  In that assessment, in the area of understanding and memory, Dr.

Noorani estimated that Ms. C. demonstrated mostly moderate limitations.  *See* AR 1899.  In the

area of sustained concentration and persistence she rated Ms. C. as "moderately" to "markedly"

limited.  AR 1899–900.  In the area of social interaction she rated Ms. C. as "moderately" to

"markedly" limited.  AR 1900.  In the area of "adaptation," she ranked Ms. C. as mostly

"markedly" limited.  *Id*.

## III.   The Commissioner's Decision

### A.     *The Initial ALJ Decision*

Based on this evidence, Administrative Law Judge Thomas Mercer Ray issued an

unfavorable disability determination on October 16, 2018.  *See* AR 133–50.  He determined at

step one that Ms. C. had engaged in substantial gainful activity after February 1, 2015—her

originally claimed onset date.  *See* AR 139.  At step two he determined that Ms. C.'s anxiety and

depression were severe, medically-determinable impairments that significantly limited her ability

to perform basic work activities.  AR 140.  At step three he held that Ms. C.'s impairments were

not so severe as to meet or equal any of the Commissioner's Listings.  *See* AR 140–42.  He noted

that he had "considered the opinions of the State Agency consultants who evaluated this issue at

earlier levels of the administrative process," and reasoned that "no acceptable medical source

designated to make equivalency findings has concluded that [Ms. C.'s] impairments medically

equal a listed impairment."  AR 140.  ALJ Ray then proceeded to assess Ms. C.'s RFC and,

based on his calculated RFC, determined at step four that Ms. C. could not perform her past work

but could, at step five, perform other jobs that exist in significant numbers in the national

economy.  AR 142–49.  That step-five determination led him to conclude that Ms. C. was not

disabled within the meaning of the Social Security Act.  AR 149.

### B.  The Council's Remand Order

On review, the Appeals Council reversed ALJ Ray's decision because it did not include

any evaluation of the "treating source opinion" of Dr. Ward, and because the decision failed to

address medical evidence that Ms. C. had been diagnosed with and was functionally limited by

PTSD.  AR 158.  The Council remanded Ms. C.'s application back to the ALJ with instructions

to further evaluate Ms. C.'s mental impairments; to further consider the "treating source opinion"

of Dr. Ward; and, if warranted, to obtain supplemental evidence from a vocational expert to

clarify the effect of Ms. C.'s reassessed RFC on her occupational capacity.  AR 159.

### C.  The ALJ's Revised Decision

A second administrative hearing was then scheduled before ALJ Ray.  *See* AR 41–46.

Ms. C. used the hearing to clarify her amended onset date.  *See* AR 43.  Aside from that issue,

9

ALJ Ray did not "feel the need to ask [Ms. C.] any questions," so no additional testimony was received.  AR 43–46.

ALJ Ray then issued his revised opinion on March 9, 2020, again holding that Ms. C. was not disabled under the Social Security Act.  AR 12.  This second decision determined that Ms. C.'s revised disability onset date satisfied the step one requirement that she not be engaged in substantial gainful activity.  *See* AR 19.  At step two, ALJ Ray added PTSD to the list of "severe impairments" that significantly limited Ms. C.'s ability to perform basic work activities.  *Id*.

ALJ Ray next determined that Ms. C.'s impairments, including her PTSD, did not singly or in combination meet or equal any of the Commissioner's Listings.  *See* AR 20.  He based that step three decision on his belief that Ms. C. did not meet the Paragraph B criteria for three potentially applicable Listings—12.04 (for "depressive, bipolar and related disorders"), 12.06 (for "anxiety and obsessive-compulsive disorders"), and 12.15 (for "trauma- and stressor-related disorders").  *See id.*; *see also* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A)(1).  The paragraph B criteria for all three listings require that a claimant's mental impairments result in "extreme" limitation in one or "marked" limitations in two of the Commissioner's Post-2017 Functional Areas.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A)(2)(b).  ALJ Ray determined that Ms. C. did not meet that requirement, because she had only "moderate" functional limitations in all four areas.  AR 20–22.  He also determined that Ms. C. failed to satisfy the Paragraph C criteria for the examined Listings because the record "does not establish that [Ms. C.] has marginal adjustment, that is, a minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life."  AR 22.  He noted that the record lacked "evidence of any psychiatric inpatient treatment or hospitalization" and did not include evidence that Ms. C. "ever lived in a highly supportive living environment."  *Id*.

10

"As for the opinion evidence," ALJ Ray assigned "great weight" to the opinions of Drs. Woods and Cott, both of whom rated Ms. C.'s functional limitations as mild to moderate.  AR 27, 29.  He assigned "little weight" to the opinions of Drs. Ward, Rosario, and Noorani, all of whom rated Ms. C.'s functional limitations as marked to extreme.  AR 27–28.  He also gave "little weight" to an assessment of Ms. C. jointly compiled by two of her social workers.  AR 28. He assigned "partial weight" to testimony from Ms. C.'s therapist.  AR 29.

Pairing this weighted opinion evidence with Ms. C.'s treatment history, objective medical findings, and Ms. C.'s subjective complaints, ALJ Ray then calculated that Ms. C. retained the residual functional capacity to perform:

> a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to performing simple one-to-four step[] routine, repetitive tasks in a low stress work environment, defined as requiring only occasional decision making and occasional changes in the work setting where there would only be occasional contact with co-workers and supervisors and no contact with the general public, and which would not require a fast pace or production quotas such as would customarily be found on an assembly line. She is limited to no exposure to hazards such as moving mechanical parts and unprotected [heights]. She further cannot operate a motor vehicle.

AR 22, 29; *see also* AR 73 (clarifying the limitation based on unprotected heights).  Based on that RFC, ALJ Ray again determined at step four that Ms. C. could not perform her past relevant work, *see* AR 30, but could at step five perform the requirements of occupations such as janitor, packer, sorter, inspector-packer, inspector, and toy packer.  AR 31.  He accordingly denied for the second time Ms. C.'s claim for benefits under the Social Security Act.  *See* AR 32.  The Appeals Council denied Ms. C.'s second request for review.  AR 1.  That decision made ALJ Ray's revised opinion the Commissioner's final decision subject to review by this Court under 42 U.S.C. § 405(g).

**LEGAL STANDARD**

The Court will uphold the Commissioner's decision to deny an individual disability benefits if the decision "is based on substantial evidence in the record and correctly applies the relevant legal standards." *Butler*, 353 F.3d at 999. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation and citation omitted); *see also Butler*, 353 F.3d at 999 (substantial evidence is "more than a scintilla, but . . . less than a preponderance"); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [in the administrative appeals context] is not high."). The Court will "carefully scrutinize" the record for substantial evidence, *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014), but will not reweigh evidence the Commissioner considered. *Brown v. Barnhart*, 370 F. Supp. 2d 286, 288 (D.D.C. 2005).

**DISCUSSION**

Ms. C. raises several challenges to the ALJ's revised decision in her filings with this Court. First, she says ALJ Ray erred in assigning little weight to the opinions of her treating physicians "regarding the severity of her mental impairments and [their] impact on her ability to function." Pl. Mem. at 13. Second, she faults ALJ Ray for not considering how her physical impairments—particularly her headaches—impact her residual functional capacity. *See id.* at 12–13, 15. Third, she is concerned that her calculated RFC does not account for her reliance on support from others when performing activities of daily living. *Id.* at 13, 20–25. Fourth, she insists that ALJ Ray erred by "misciting and misconstruing evidence that did not support his findings throughout his analysis of Ms. [C.]'s functional limitations at step 3 and her residual functional capacity." *Id.* at 25. Fifth and finally, she challenges the adequacy of the hypotheticals posed to the vocational expert during her administrative hearings, and accordingly

ALJ Ray's ultimate conclusion that she could perform work that exists in significant numbers in the national economy.  *Id.* at 13, 30–31.

The Commissioner defends the agency's decision by assuring the Court that ALJ Ray "ably canvassed the medical and non-medical evidence of record" and, "[g]iven the numerous and varied opinions in the record, . . . performed his duty admirably in scrutinizing the evidence and weighing the opinions."  Def. Mem. at 4, 21.  The Commissioner further contends that under the "deferential standard of review" applicable to this appeal, the agency's decision should be affirmed.  *Id.* at 2 (citing *Biestek*, 139 S. Ct. at 1154).

The first and fourth of Ms. C.'s concerns—that ALJ Ray violated the treating physician rule and miscited or misconstrued evidence in the record—both relate (in part) to the step three conclusion that Ms. C.'s impairments do not meet or equal an entry in the Listings.  The Court accordingly addresses these issues first, before turning to concerns related to Ms. C.'s RFP—an assessment that occurs "[b]efore we go from step three to step four."  20 C.F.R. § 404.1520(a)(4), (e); *id.* § 416.920(a)(4), (e).

## I.    The Treating Physician Rule

Under binding D.C. Circuit precedent, disability claims filed before March 27, 2017, are subject to a "treating physician rule."  *Butler*, 353 F.3d at 1003 (articulating the rule); *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993) (same); 20 C.F.R. §§ 404.1513, 416.913 (noting the sunset date for §§ 404.1527 and 416.927—the regulations underlying the treating physician rule).[7]  The rule makes a disability claimant's treating physician's report "'binding on the fact-

---

[7] This Circuit's treating physician rule is based on regulations codified at 20 C.F.R. §§ 404.1527 and 416.927.  *See Butler*, 353 F.3d at 1003.  Those regulations have since been revised.  *See* 82 Fed. Reg. 5844, 5865 (Jan. 18, 2017) (adopting revised rules for weighing opinion evidence); 20 C.F.R. § 404.1513 (noting the March 2017 sunset date for § 404.1527); *id.* § 416.913 (same, for § 416.927).  This case involves a claim for benefits filed in November 2015, *see* AR

finder unless [the physician's opinion is] contradicted by substantial evidence.'" *Butler*, 353

F.3d at 1003 (quoting *Williams*, 997 F.2d at 1498).  Functionally, this creates a rebuttable

presumption in favor of treating physicians' opinions of claimants' conditions.  *Turner v. Astrue*,

710 F. Supp. 2d 95, 105 (D.D.C. 2010) (citing *Poulin v. Bowen*, 817 F.2d 865, 873 (D.C. Cir.

1987)).  The presumption can be overcome, but to show compliance with the rule, any ALJ who

departs from a treating physician's opinion "bears the burden of explaining why he [or she] has

rejected the treating physician's opinion and how the doctor's assessment is 'contradicted by

substantial evidence.'" *Id.* (quoting *Williams*, 997 F.2d at 1498).  The rule stems from

regulations directing the Commissioner to accord "controlling weight" to a treating source's

medical opinion if it "is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The premise is that "a claimant's treating

physicians have great familiarity with [her] condition," so their reports deserve "substantial

weight."  *Butler*, 353 F.3d at 1003.

### A.    *Ms. C.'s Treating Physicians*

To assess Ms. C.'s challenge that ALJ Ray violated the treating physician rule, the court

must first identify Ms. C.'s "treating physicians."  A treating physician is one who "has provided

[the claimant] with medical treatment or evaluation" as part of "an ongoing treatment

relationship."  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  An "ongoing treating relationship" is

evident where a claimant has seen the provider "with a frequency consistent with accepted

---

279, 283, and the Commissioner says the regulations in place at the time Ms. C. filed her claim
control here.  *See* Def. Mem. at 17 n.3.  The Court thus need not consider whether the
Commissioner's adoption of new regulations governing the evaluation of opinion evidence permits
this Court to deviate from the D.C. Circuit's treating physician rule in *Butler* and *Williams*.  The
rule clearly applies to this case.

medical practice . . . for [the claimant's] medical condition(s)," even if the provider has treated the claimant only "a few times." *Id*. A doctor is not a treating physician, on the other hand, if the doctor's relationship with the claimant is so brief that the doctor is essentially "on the same footing as the government's consulting physicians." *Simms v. Sullivan*, 877 F.2d 1047, 1052 (D.C. Cir. 1989).

The record shows that Drs. Ward and Noorani qualify as Ms. C.'s treating physicians. The record contains two reports from Dr. Ward, both dated November 13, 2015. *See* AR 612–15, 334–35. Ms. C.'s relationship with Dr. Ward extends beyond that single encounter, however, as Ms. C. met with Dr. Ward after first meeting with a licensed professional counselor at Dr. Ward's workplace, Preventative Measures WDC. *See* AR 616–21. One of Dr. Ward's reports also includes the instruction that Ms. C. should return for a follow-up appointment in two weeks. *See* AR 615. The agency's Appeals Council moreover presumed that Dr. Ward qualified as Ms. C.'s treating physician. *See* AR 158.

The record is more complete for Dr. Noorani. She saw Ms. C. at least six times between November 2017 and February 2020. *See* AR 1182–83, 1225–26, 1293–94, 1318–19, 1426–27, 1899–901. At most of these visits Dr. Noorani reviewed Ms. C.'s medication regimen, commented on her symptoms, and confirmed her diagnosis of PTSD. *See id*. The treatment relationship is also related to a longer, more frequent treatment relationship between Ms. C. and the McClendon Center, where Dr. Noorani practiced. *See* AR 864–1332. Ms. C. saw a variety of providers at the McClendon Center between February 2016 and January 2020. *See* AR 864, 1650. Dr. Noorani also referred Ms. C. to outside specialists for additional treatment. *See* 1890. Collectively, this evidence suggests that Ms. C.'s relationships with both Drs. Ward and Noorani were ongoing, extending beyond the brief encounters typical for government agency consulting

physicians.  *Cf. Simms*, 877 F.2d at 1052.  Further, the Commissioner does not dispute that Drs. Noorani and Ward should be regarded as treating physicians.  *See* Def. Mem. at 16.

By contrast, the record suggests that Drs. Rosario, Woods, and Cott had only short encounters with Ms. C., all centered on assessing Ms. C.'s eligibility for government benefits. The sole report in the record by Dr. Rosario is her November 2015 report for the D.C. Department of Human Services Income Maintenance Administration—an agency tasked with providing financial, medical, and food stamp assistance to eligible residents of the District.[8]  *See* AR 516–17; D.C. Code § 1-1503.1(IV)(C)(6).  Similarly, Dr. Woods conducted a single examination of Ms. C. in March 2016.  *See* AR 518–25.  The report generated from that encounter specifies that Ms. C. was "examined for a consultative examination."  AR 525.  Dr. Cott's report likewise shows up exclusively in Ms. C.'s state agency disability determinations, because she assessed Ms. C. solely as a state agency non-examining expert.  *See* AR 83–87, 89, 94–98, 100.  In sum, then, Ms. C.'s treating physicians are Drs. Ward and Noorani.  Drs. Rosario, Woods, and Cott must be considered non-treating, consulting physicians.

## B.      *The ALJ's Application Of the Treating Physician Rule*

Having distinguished Ms. C.'s treating and non-treating physicians, the Court must next determine whether ALJ Ray correctly applied the D.C. Circuit's treating physician rule.  Under the rule, the opinions of Drs. Ward and Noorani are presumptively entitled to controlling weight unless the ALJ demonstrates that they conflict with substantial evidence in the record.  *See Butler*, 353 F.3d at 1003; *Turner*, 710 F. Supp. 2d at 105.  The doctors' shared opinion is that Ms. C. has "extreme" limitations in her ability to function socially or is "markedly limited" in

---

[8] Dr. Noorani also filled out forms for the D.C. Income Maintenance Administration.  *See* AR 1426–27.  Dr. Rosario is not a consulting physician because she filled out the agency's form, then, but because that report is the only documentation of her relationship with Ms. C. in the record.

her social interactions.  AR 335, 1427, 1900.  They also share the opinion that Ms. C. has

"marked" limitations in her activities of daily living and from repeated episodes of

decompensation.  AR 335, 1427.  They differ in the rating assigned to Ms. C.'s ability to

maintain concentration, persistence, or pace—Dr. Ward assessed Ms. C.'s limitations in that area

as "extreme," AR 335, while Dr. Noorani assessed Ms. C.'s limitations as "marked."  AR 1427,

1899–900.  Dr. Noorani also expressed the opinion that Ms. C. was mostly "moderately" limited

in her ability to understand and remember and "markedly" limited in her ability to adapt to

changes, navigate unfamiliar places, and set realistic goals independently from others.  AR 1900.

ALJ Ray assigned these opinions "little weight."  AR 27, 28–29.  He instead assessed

Ms. C.'s functional limitations as uniformly "moderate," AR 20–21, largely consistent with the

opinion of consulting examiner Dr. Cott.  *See* AR 29.  There is no inherent error in that decision,

as the treating physician rule creates only a rebuttable presumption in favor of treating

physicians' reports.  *See Turner*, 710 F. Supp. 2d at 105.  An ALJ can overcome the presumption

by articulating "good reasons" for setting aside a treating physician's opinion.  *Butler*, 353 F.3d

at 1003; *see also Grant v. Astrue*, 857 F. Supp. 2d 146, 153 (D.D.C. 2012) ("When an ALJ

disregards the opinion of a treating physician, he must explain his reasons for doing so.").  One

"good reason" is if the treating physician's opinion is "inconsistent with the other substantial

evidence" in the record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Butler*, 353 F.3d at

1003.  Another acceptable reason is that the treating physician's opinion is "conclusory."

*Broyles v. Astrue*, 910 F. Supp. 2d 55, 62 (D.D.C. 2012).  An ALJ might also decline to give a

treating physician's opinion controlling weight if the physician contradicts him- or herself or

presents incompatible conclusions.  *See Page v. Berryhill*, 688 F. App'x 7, 9 (D.C. Cir. 2017)

(affirming an ALJ's decision to discard a treating physician's opinion that a claimant was unable

to work because the physician also stated the claimant was "capable of 'low stress' work"). Whatever the reason given, the ALJ bears the burden of explaining why the treating physician's opinion was appropriately rejected.  *Turner*, 710 F. Supp. 2d at 106.

ALJ Ray's explanations here do not justify his decision to assign little weight to the opinions of Ms. C.'s treating physicians.  He provided four reasons for rejecting Dr. Ward and Dr. Noorani's reports: (1) he found the reports inconsistent with evidence that Ms. C. "generally responded relatively well to psychotherapy," AR 27, 28; (2) he found the physicians' reports "inconsistent with [Ms. C.'s] ability to maintain her personal care grooming, prepare light meals, perform household chores, shop in stores, pay bills, count change, care for two disabled minors, follow simple instructions, and manage her sons' social security benefits," AR 27–28 (citing AR 350–55 and "[t]estimony"); (3) he found Dr. Noorani's opinions inconsistent with records indicating that Ms. C. "traveled for vacation, maintained contact with a friend, met with school administrators concerning her child's conduct, attended Zumba and yoga, and expressed an intention to attend a Caribbean festival,"  AR 28 (citing AR 1286, 1298, 1311–12, 1316, 1671, 1677); and (4) because Dr. Noorani's opinions did not account for observed "variability in the claimant's presentation," AR 28–29 (citing AR 1890–91).  ALJ Ray also cited record evidence in support of his contrary conclusions that Ms. C. had only "moderate" functional limitations.  *See* AR 20–21.  And the Commissioner adds that (5) as a legal matter, "final responsibility" for determining issues dispositive of a disability claim are "reserved exclusively to the Commissioner[,] who will not give any special significance to the source of an opinion on [the] issue."  Def. Mem. at 17 (citing 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3)).

To give ALJ Ray's opinion the deference it deserves, the Court will address all of the explanations provided for rejecting Ms. C.'s treating physicians' opinions that Ms. C. has

"marked" or "extreme" functional limitations, as well as the evidence ALJ Ray cited in support of rating her functional limitations as "moderate."  The Court does so while bearing in mind Ms. C.'s overarching concern that ALJ Ray miscited or misconstrued evidence in the record to justify his conclusions.  *See* Pl. Mem. at 25.

       1.     *Ms. C.'s Positive Response To Psychotherapy Does Not Defeat the Presumption Favoring Her Treating Physicians' Reports.*

The first explanation ALJ Ray offered for discounting Dr. Ward and Dr. Noorani's opinions is that the physicians' reports were inconsistent with evidence that Ms. C. "generally responded relatively well to psychotherapy."  AR 27, 28.  Ms. C. notes that ALJ Ray did not cite record evidence for this summary finding.  *See* Pl. Mem. at 18.  ALJ Ray did note, however, that Ms. C. "has no history of inpatient psychiatric treatment or hospitalization."  AR 28.  He also described evidence that, "[a]lthough [Ms. C.] initially complained of sleep interruption, social anxiety, hypervigilance, and nightmares, . . . many of her symptoms improved with treatment," including psychotherapy and medication.  AR 24.  There may well be substantial evidence in the record, then, that Ms. C. responded well to psychotherapy.

Yet even if true, Ms. C.'s response to therapy is no reason to afford Ms. C.'s treating physicians' opinions little weight.  Her positive response to therapy is not inconsistent with her doctors' conclusions.  Dr. Noorani had been actively treating Ms. C. for months before she offered her opinions about Ms. C.'s functional limitations.  *See* AR 1182–83, 1225–26, 1293–94, 1318–19, 1426–27.  Her 2018 report specifically notes that Ms. C. remained "significantly symptomatic despite current treatment."  AR 1426.  Dr. Noorani's opinion was thus that Ms. C. retained extreme and marked functional limitations *despite* her relatively positive response to therapy.  Dr. Noorani also assessed Ms. C. several years after Dr. Ward, suggesting that, in her

treating doctor's opinion, regular therapy sessions over the course of several years had not significantly altered Ms. C.'s functional limitations.

The Commissioner's brief to this Court does not shed any further light on ALJ Ray's reasoning.  The Commissioner accurately describes how "in discussing Dr. Ward's opinion, the ALJ carefully noted . . . that Plaintiff responded well to mental health treatment and did not require impatient treatment."  Def. Mem. at 18; *see also id.* at 19 (describing the same justification in relation to Dr. Noorani's opinion).  The Commissioner concludes that, "[a]s the ALJ determined, these facts failed to support the marked and extreme limitations contained in" Ms. C.'s treating doctors' opinions.  *Id*.  There is again no explanation for the relationship between the fact cited and the conclusions reached.  ALJ Ray's first explanation thus does nothing to rebut the presumption favoring the reports of Drs. Ward and Noorani.

> 2.  *Ms. C.'s Personal Care Activities Do Not Undermine Her Treating Physicians' Reports, And the ALJ Misconstrued Evidence Of Her Role In Caregiving And Managing Her Sons' Disability Benefits.*

The second reason ALJ Ray gave for assigning little weight to the opinions of Ms. C.'s treating physicians is that record evidence suggested that Ms. C. could groom herself, prepare light meals, perform household chores, shop in stores, pay her bills, count change, follow simple instructions, and care for her two disabled sons, including by managing their social security benefits.  *See* AR 27–28.  Ms. C. insists that this characterization "is an inaccurate description of [her] functional abilities and fails to account for the significant support she requires on a daily basis from her caseworkers and therapist to complete [the listed] tasks."  Pl. Mem. at 18.  The Commissioner responds primarily by echoing the ALJ's characterization of the record evidence. *See* Def. Mem. at 18–19.

i.      Personal Care Activities

The record provides substantial evidence to support ALJ Ray's conclusion that Ms. C.

can independently complete personal care activities such as grooming herself, performing routine

household chores, and occasionally shopping in stores.  She completed a "Function Report" in

December 2015—the month after she applied for benefits and less than a month before her

amended onset date—which ALJ Ray cited in support of this finding.  *See* AR 27–28, 350–57.

In the report, in response to a question asking "what you do from the time you wake up until

going to bed," Ms. C. wrote that she showers, prepares breakfast, bathes her younger son,

"supervise[s] the children's personal care," and takes them to school.  AR 351.  She wrote that

she then attends her own scheduled appointments "and if not address[es] the needs with my

children['s] unscheduled appointments."  *Id*.  She reported being able to count change, pay bills,

and use a checkbook, but not the ability to manage a savings account.  AR 353.  She wrote that

she goes to the store "once a month."  AR 354.  She also wrote that "laundry, cooking + cleaning

are taken care of as needed."  AR 351.  That last statement, while ambiguous, could be

reasonably interpreted by the ALJ as describing additional tasks Ms. C. accomplished on her

own, rather than tasks that were "taken care of" by others on Ms. C.'s behalf.

ALJ Ray cited this Function Report in support of his assessment that Ms. C. could

independently care for herself, and that Ms. C.'s treating physicians' opinions were therefore

inconsistent with the record evidence.  *See* AR 27–28.  But as with the explanation based on Ms.

C.'s response to psychotherapy, he did not explain why these personal care activities are

inconsistent with Dr. Ward and Dr. Noorani's overarching opinions about Ms. C.'s functional

limitations.  Only one of the four Pre-2017 Functional Areas measured by the Commissioner is

related to personal care activities.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C) (version eff.

Aug. 12, 2015 to May 23, 2016).  That area—"activities of daily living"—measures the extent to

which a claimant can independently, effectively, and sustainably engage in "adaptive activities

such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a

residence, [and] caring appropriately for your grooming and hygiene." *Id.* § 12.00(C)(1).  The

evidence cited by ALJ Ray might justify assigning little weight to Dr. Ward and Dr. Noorani's

opinions that Ms. C. has "marked" limitations in this functional area.  *See* AR 335, 1427.  Ms.

C.'s report that she bathes, cooks, cleans, shops, manages her money to some extent, and helps

care for her children is at least directly relevant to that assessment.

Yet ALJ Ray did not ultimately base his disability determination on Ms. C.'s functional

ability to engage in "activities of daily living."  He instead considered Ms. C.'s functioning in the

four broad areas measured by the Commissioner after January 2017—a list that no longer

contains activities of daily living.  *Compare* AR 20–21 *with* 20 C.F.R. pt. 404, subpt. P, app. 1

§ 12.00(C) (version eff. Aug. 12, 2015 to May 23, 2016); 81 Fed. Reg. at 66160; *see also supra*

note 6 (explaining the shift in regulations).

That does not mean Ms. C.'s personal care activities are irrelevant.  ALJ Ray relied on

Ms. C.'s daily living activities in reaching his conclusion that she had only "moderate"

limitations in the Post-2017 Functional Areas of understanding, remembering, or applying

information; concentrating, persisting, or maintaining pace; and adapting and managing herself.

*See* AR 20–21.  His reasoning was that "[d]espite her alleged memory deficits," Ms. C. "could

maintain her personal care grooming, prepare light meals, perform household chores, shop in

stores, pay bills, count change, take her son to school, and follow simple instructions."  AR 20.

Similarly, he reasoned that "[a]lthough she alleged concentration difficulties," Ms. C. "could

maintain her personal care grooming, prepare light meals, perform household chores, shop in

stores, pay bills, count change, take her son to school, and follow simple instructions." AR 21.

He also noted that Ms. C. "alleged difficulty handling stress and adapting to changes in routine,"

yet "could maintain her personal care grooming, prepare light meals, perform household chores,

shop in stores, pay bills, count change, take her son to school, and follow simple instructions."

*Id*.

If the last three sentences sound repetitive, it is because they are. ALJ Ray invoked this

list of Ms. C.'s routine self-care activities word-for-word in all three of his functional limitation

analyses. *See* AR 20–21. He did not, however, explain the connection between Ms. C.'s

personal care activities and her varied functional abilities to concentrate, remember, and adapt to

stress. The problem is not that such a connection is unfathomable. It is that the connection is

presumably different for each functional ability. The Commissioner, after all, measures the

abilities as three distinct functional areas. *See* 20 C.F.R. § 404.1520a(c)(3); *id.* pt. 404, subpt. P,

app. 1 § 12.00(E). And rather than articulate how this same evidence was connected to his

conclusions about three of Ms. C.'s distinct abilities to function, ALJ Ray invoked Ms. C.'s daily

personal care activities as a catch-all excuse. That is not enough to satisfy this Court's

"deferential standard of review." Def. Mem. at 2 (citing *Biestek*, 139 S. Ct. at 1154). The law

requires "more—that the ALJ build an accurate and logical bridge from the evidence to his

conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate

findings and afford a claimant meaningful judicial review." *Lane-Rauth v. Barnhart*, 437 F.

Supp. 2d 63, 67 (D.D.C. 2006) (internal quotation and alteration omitted).

A similar problem attends the connection (if any) between Ms. C.'s personal care

activities and her treating physicians' other opinions, including their shared opinion that Ms. C.

has "extreme" limitations functioning socially. AR 335, 1427. Only Ms. C.'s tolerance for

shopping in stores could relate to her social functioning, which measures a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals," including people such as "grocery clerks." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(2) (version eff. Aug. 12, 2015 to May 23, 2016). But the link is not obvious, particularly in light of other record evidence that Ms. C. goes to stores, the bank, and appointments for her children only with the assistance of her friend Bernard. *See* AR 21, 59, 61, 63. An ALJ must ordinarily explain how his or her conclusion factors in "obviously probative exhibits, including evidence that was rejected." *Warfield v. Colvin*, 134 F. Supp. 3d 11, 14 (D.D.C. 2015) (internal citation and quotation omitted). There is no such explanation here.

ii.     Caregiving And Management Of Benefits

ALJ Ray did not point solely to Ms. C.'s personal care activities when explaining why he departed from Ms. C.'s treating physicians' opinions. He also observed that Ms. C. could "care for two disabled minors . . . and manage her sons' social security benefits." AR 27–28. As evidence of these activities, he cited Ms. C.'s December 2015 Function Report and testimony received during the administrative hearings. *See id*.

The cited evidence does not demonstrate that Ms. C. can independently, effectively, or consistently care for her sons or manage their benefits. At the August 2018 hearing, Ms. C. unambiguously testified that she does not care for her sons. *See* AR 60 ("I don't take care of them."). She testified that two home health aides come to her house each day to attend to her sons' needs, and that they sometimes stay overnight. AR 59–60. She also testified that she relies on support from her friend Bernard to attend her sons' school meetings. AR 61–62. Ms. C.'s therapist also testified that Ms. C. "become[s] very anxious and overwhelmed" when presented with paperwork about her sons' benefits, and that she "struggles to understand the documents or

to complete the tasks . . . without assistance."  AR 67.  Ms. C.'s written description of her

caregiving activities in the Function Report—the other evidence cited by ALJ Ray—does not

contradict this testimony.  *See* AR 351 (noting that Ms. C. "supervise[s] the children's personal

care" and "take[s] them to school").  And other evidence in the record not cited by ALJ Ray

lends further support.  *See* AR 1030 (describing Ms. C.'s caregiving efforts and noting that

"being able to accomplish all of these task[s] [is] stressful and take[s] a toll on her energy and

mental health"); AR 1298 (describing Ms. C.'s distress of "having both children yesterday"); AR

1330 (noting that a support specialist at the McClendon Center "was needed to assist client in

completing renewal application" for "government assistance for her son").

     Ms. C.'s treating physicians acknowledged that Ms. C. struggles with these caregiving

and benefits management responsibilities.  *See* AR 524, 1182.  ALJ Ray did not.  That oversight

further demonstrates that ALJ Ray's second stated reason for departing from Ms. C.'s treating

physicians' opinions is insufficient under this Circuit's treating physician rule.

     3.    *The ALJ Misconstrued Evidence About Ms. C.'s Social Activities.*

     ALJ Ray's third reason for assigning little weight to Dr. Noorani's opinions[9] is that he

found her functional limitation rankings for Ms. C. inconsistent with records indicating that Ms.

C. "traveled for vacation, maintained contact with a friend, met with school administrators

concerning her child's conduct, attended Zumba and yoga, and expressed an intention to attend a

Caribbean festival."  AR 28 (citing AR 1286, 1298, 1311–12, 1316, 1671, 1677).  Ms. C.

suggests that "the records cited do not mention vacation, Zumba, or yoga class" and instead

"document [her] severe social anxiety."  Pl. Mem. at 27.  The Commissioner does not respond to

this concern, instead citing additional evidence to show that Ms. C. "described having 'good

_____

[9] This was not cited by ALJ Ray as a justification for affording little weight to the opinion
of Dr. Ward.  *See* AR 27–28.

days'" that involved "spending time with a friend," among other social activities.  Def. Mem. at 5 (citing AR 576, 1051, 1067).

The Court has reviewed the evidence cited by both ALJ Ray and the Commissioner, and is disappointed that Ms. C. is almost entirely correct.  ALJ Ray not only misconstrued evidence in the record.  Some of his findings have absolutely no connection to the record evidence.  The evidence cited does not indicate that Ms. C. ever attended Zumba, yoga, or any other fitness class.  She did note in one therapy session that she "had gone on vacation."  AR 1286.  But the session notes are primarily about Ms. C.'s "confusion and distress" on returning to find that police had come to her home to conduct a child protective services check.  *Id.*

Also troubling is ALJ Ray's characterization of the evidence about Ms. C.'s "intention to attend a Caribbean festival."  AR 28.  The record that supports that finding shows that Ms. C. identified the Caribbean festival as an "event she would like to attend but is currently hesitant on going [to] due to the environment"—that is, the "large groups of people" she anticipated would attend.  AR 1311–12.  Ms. C.'s therapist "encouraged" her to consider the festival an "opportunity" to "get to a comfortable level of functioning in social setting[s] and . . . desensitize her fears and phobia."  *Id.*  Ms. C. responded that she would "follow up with her friend about going" but did not want to be "forced to get over her fears."  *Id.*

Similar caveats are evident in the record supporting ALJ Ray's observation that Ms. C. met with school administrators about her son.  The fact of the meeting appears in another of Ms. C.'s therapy session notes, in which she shared that she had "a meeting at her older son's school this afternoon."  AR 1298.  Immediately after, the notes indicate that Ms. C.'s therapist "helped [Ms. C.] process her feelings about the meeting," including her "fear of getting overwhelmed."  *Id.*  ALJ Ray's decision to cite portions of Ms. C.'s statements—that she considered attending a

26

festival, or had a meeting with school administrators—without crediting the caveats to those same statements—that she was hesitant to attend the festival because of the number of people that would be present, or feared becoming overwhelmed at the school meeting—casts a pall of suspicion over his entire analysis, suggesting his decision to set aside Ms. C.'s treating physician's opinions was neither grounded in substantial evidence nor based on good reasons. Because ALJ Ray also did not explain why Ms. C.'s maintaining contact with "a friend" is inconsistent with Dr. Noorani's opinion that Ms. C. has an "extreme" limitation with social functioning or a "marked" limitation with social interactions, AR 28, 1427, 1900, this third explanation does not justify ALJ Ray's decision to afford Ms. C.'s treating physicians' opinions little weight.

> 4.    *Evidence Of "Variability" In Ms. C.'s Presentation Does Not Justify Assigning Little Weight To the Opinions Of Ms. C.'s Treating Physicians.*

ALJ Ray's last stated reason for departing from Ms. C.'s treating physicians' opinions is that Dr. Noorani noticed "variability in [Ms. C.'s] presentation," because Ms. C. was once observed speaking "articulately on the phone with one of her son's schools." AR 28–29, 1891. The observation was noted in relation to a cognitive evaluation of Ms. C. conducted in October 2019. *See id.* Ms. C. describes the phone call as an "isolated incident" that is not necessarily inconsistent with Dr. Noorani's opinions "based on years of treating" Ms. C. Pl. Mem. at 18.

Ms. C. is right. Neither her observed "variability" nor the phone call amounts to substantial evidence supporting ALJ Ray's decision to afford Ms. C.'s treating physicians' opinions little weight. The cited record indicates that the observations were recorded when Dr. Noorani referred Ms. C. to an outside specialist, Dr. Antonio N. Puente,[10] for a

---

[10] Ms. C. has raised a concern that ALJ Ray did not "discuss, evaluate, or assign weight to Dr. Puente's opinion" in his disability determination decisions. Pl. Mem. at 19. Because the Court will reverse on other grounds, as explained below, this opinion does not reach the issue.

neuropsychological evaluation.  AR 1891.  Dr. Noorani was apparently concerned that Ms. C.

might be intellectually disabled or expressing signs of a learning disorder or cognitive

dysfunction, possibly as a result of her PTSD or a traumatic brain injury.  *Id*.  Dr. Noorani

explained to Dr. Puente that Ms. C. appeared "functionally dependent" while also noting

"variability in her presentation," including the articulate phone call.  *Id*.  Dr. Puente then

administered a series of neuropsychological tests and concluded that Ms. C. "produced a grossly

abnormal exam with prominent cognitive dysfunction and pervasive psychiatric distress."  AR

1894.  He cautioned, however, that due to inconsistencies in her performance the results were

"*unlikely* to reflect a reasonably reliable and valid assessment of [Ms. C.'s] current functioning."

AR 1892 (emphasis original).

   Four months later, Dr. Noorani filled out a form rating Ms. C.'s "capacity" to "sustain" a

number of activities "over a normal workday and workweek, on an ongoing basis."  AR 1899.

The form offered five categories of activities and specified that "markedly limited" reflected the

most extreme limitations in a patient's functional capacities.  *See id*.  Dr. Noorani rated Ms. C.'s

understanding and memory as mostly "moderately" limited; her ability to sustain concentration

and persist as between "moderately" and "markedly" limited; her ability to interact socially as

mostly "markedly" limited; and her adaptation skills as largely "markedly" limited.  AR 1899–

900.

   There is not anything inherently inconsistent about Dr. Noorani's observations and

communications to Dr. Puente and her assessment, just a few months later, that Ms. C. was

significantly limited in her ability to sustain a variety of activities on a regular, ongoing basis.  A

similar example from *Butler* usefully illustrates why.  There, the D.C. Circuit was asked to

consider whether a treating physician's opinion that a claimant could not functionally lift was

properly discounted based on evidence that the claimant could lift a half-gallon of milk.  *Butler*, 353 F.3d at 1002.  The court faulted the ALJ for failing to explain "how [the claimant's] *occasional* lifting a half-gallon of milk conflicts with [her treating physician's] opinion that [the claimant] could not lift *as part of her regular and continuous work-activity*."  *Id.* (emphasis added).  That same disconnect is present here: If there is tension between Ms. C.'s occasional ability to speak articulately and her physician's opinion that she could not do so regularly and continuously, an ALJ must do more than merely point out the two observations to comply with the treating physician rule.  As in *Butler*, ALJ Ray's reasoning here "is not simply 'spare,' . . . in crucial particulars it is missing."  353 F.3d at 1002.  "This simply will not do."  *Id*.

> 5.    The "Special Significance" Exception Does Not Apply.

Two final issues raised by the Commissioner also require comment.  In her brief to this Court, the Commissioner suggests that ALJ Ray had sufficient reason to reject Ms. C.'s treating physicians' opinions' because they were "contradicted" by the opinions of the state agency psychologists such as Dr. Cott.  Def. Mem. at 19.  The Commissioner notes that state agency consultants are "experts in SSA disability programs" and points the Court to SSR 96-6p, which counsels that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."  *Id.* at 18–19 (quoting SSR 96-6p, 1996 WL 374180).

There are two problems with this argument.  First, it seems to be a post-hoc rationalization not appropriate for this Court's review.  *See Butler*, 353 F.3d at 1002 n.5 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  The various physicians' opinions in this case are indeed inconsistent.  But ALJ Ray did not note that inconsistency as a reason he discounted the opinions of Drs. Ward and Noorani; he instead compared the doctors' reports to other, non-

opinion evidence in the record.  *See* AR 27–29.  Second, the treating physician rule would have

no practical effect if a non-treating physician's conflicting opinion could on its own provide

substantial evidence to justify setting aside the treating physician's report.  The D.C. Circuit has

implicitly acknowledged as much.  *See Butler*, 353 F.3d at 997, 1002 & n.6 (holding that, "in

view of [treating physician] Lightfoote's consistent opinions to the contrary, [consultative

examiner] Hall's report, without more, does not constitute substantial evidence").  And SSR 96-

9p is not to the contrary.  There are surely "appropriate circumstances" for privileging a

consultive examiner's opinion over that of a treating physician; mere conflict between the

physicians' assessments is just not one of them.

Lastly, the Commissioner points out as a legal matter that "final responsibility" for

determining issues dispositive of a disability claim is "reserved exclusively to the

Commissioner[,] who will not give any special significance to the source of an opinion" relied

on.  Def. Mem. at 17 (citing 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3)).  In articulating this

rule, the regulations classify certain kinds of assessments as "not medical opinions" but

"opinions on issues reserved to the Commissioner because they are administrative findings that

are dispositive of a case."  20 C.F.R. §§ 404.1527(d), 416.927(d).  One such issue is whether a

claimant meets the statutory definition of disability.  *See id*. §§ 404.1527(d)(1), 416.927(d)(1).[11]

Another issue reserved to the Commissioner is that a claimant's impairments meet or equal the

requirements of a Listing.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The Commissioner is

---

[11] ALJ Ray signaled awareness of this rule in his assessment of Dr. Noorani's opinion.  *See* AR 29 (discounting Dr. Noorani's "statement of disability" as a "legal conclusion reserved for . . . the Commissioner"); AR 1426 (Dr. Noorni's statement that Ms. C.'s anxiety and functional limits were "quite disabling").

correct that no "special significance" is assigned to the "source of an opinion" on these and similar issues. *Id.* §§ 404.1527(d)(3), 416.927(d)(3).

But Drs. Ward and Noorani did not offer opinions on whether Ms. C.'s impairments met or equaled a Listing. They offered assessments of her functional limitations—assessments the D.C. Circuit has previously treated as "opinions" subject to the treating physician rule. *See Butler*, 353 F.3d at 1003; *Williams*, 997 F.2d at 1498–99. And the regulations seem to acknowledge a difference between opinions "on the nature and severity of [a claimant's] impairment(s)"—the issue Ms. C.'s physicians opined on—and the ultimate question of whether a claimant "meets or equals the requirements of any impairment(s)" in the Listings—the step three determination that might compel the Commissioner to conclude that a claimant meets the statutory definition of disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). There is no legal reason, then, to discount the special significance of Ms. C.'s treating physicians' opinions in this case. And because ALJ Ray did not point to substantial evidence or good reasons to depart from their opinions, his decision violates the treating physician rule and must be reversed.

## II.     The Impact Of The ALJ's Legal Error

Because the ALJ here did not articulate a good reason to depart from Dr. Ward and Dr. Noorani's opinions, the opinions are entitled to controlling weight. Their opinions are that Ms. C. has "extreme" limitations functioning socially, AR 335, 1427; "marked" limitations with social interactions, AR 1900; "marked" limitations related to repeated episodes of decompensation, AR 335, 1427; a "marked" inability to adapt to changes, navigate unfamiliar places, and set realistic goals independently from others, AR 1900; and "marked" to "extreme" limitations maintaining concentration, persistence, or pace, AR 335, 1427, 1899–900.

These opinions are directly relevant to the Commissioner's step three assessment of whether Ms. C.'s impairments meet or equal an entry in the Listings.  The Paragraph B requirements for Listings 12.04 (for "depressive, bipolar and related disorders"), 12.06 (for "anxiety and obsessive-compulsive disorders"), and 12.15 (for "trauma- and stressor-related disorders") are today[12] the same: "To satisfy the paragraph B criteria, [the claimant's] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning" the Commissioner has measured since January 2017.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2)(b).  Those areas of functioning are (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  *Id*.

The opinions of Drs. Ward and Noorani do not correspond in every particular to these categories, as they primarily assessed Ms. C.'s limitations using the Pre-2017 Functional Areas measured by the Commissioner before January 2017.  Their opinions nonetheless constitute binding evidence that Ms. C. met the Paragraph B criteria for all three Listings.   Both doctors consistently ranked Ms. C.'s social functioning or interactions with others as extremely or markedly limited.  *See* AR 335, 1427, 1900.  They ranked her ability to concentrate, persist, or maintain pace—a category that did not change with the shift in regulations in 2017—as either marked or extreme.  *See* AR 335, 1427, 1899–900.  Ms. C.'s treating physicians thus agree that Ms. C. has *at least* marked limitations in the areas of interacting with others and concentrating, persisting, or maintaining pace.  Dr. Noorani moreover assessed that Ms. C. is markedly limited

---

[12] Footnote six above discusses the shift in the areas of functioning measured by the Commissioner before and after 2017.  Entry 12.15 was also added to the Listings in January 2017. *See* 81 Fed. Reg. at 66154.

in several capacities involved in adapting or managing herself.  *See* AR 1900.  Ms. C. can thus as

a matter of law meet the Paragraph B criteria for Listings 12.04, 12.06, and 12.15.

That is not enough on its own.  To match any of these Listings, Ms. C. must also satisfy

their Paragraph A criteria.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A)(2).  The Paragraph

A criteria for Listing 12.04 require medical documentation of:

> (1) Depressive disorder, characterized by five or more of the following:
> (a) Depressed mood; (b) Diminished interest in almost all activities; (c) Appetite
> disturbance with change in weight; (d) Sleep disturbance; (e) Observable
> psychomotor agitation or retardation; (f) Decreased energy; (g) Feelings of guilt or
> worthlessness; (h) Difficulty concentrating or thinking; or (i) Thoughts of death or
> suicide; or

(2) bipolar disorder, which is not relevant here.  *Id.* § 12.04(A).  The Paragraph A criteria for

Listing 12.06 require medical documentation of:

> (1) Anxiety disorder, characterized by three or more of the following:
> (a) Restlessness; (b) Easily fatigued; (c) Difficulty concentrating; (d) Irritability;
> (e) Muscle tension; or (f) Sleep disturbance; or

(2) panic disorder or (3) obsessive-compulsive disorder, which are not relevant here.  *Id.*

§ 12.06(A).  The Paragraph A criteria for Listing 12.15 require medical documentation of:

> (1) Exposure to actual or threatened death, serious injury, or violence;
> (2) Subsequent involuntary re-experiencing of the traumatic event (for example,
> intrusive memories, dreams, or flashbacks); (3) Avoidance of external reminders of
> the event; (4) Disturbance in mood and behavior; and (5) Increases in arousal and
> reactivity (for example, exaggerated startle response, sleep disturbance).

*Id.* § 12.15(A).

ALJ Ray did not assess whether the medical evidence in the record demonstrated that Ms.

C. met any of these Paragraph A criteria.  *See* AR 20–22.  Ordinarily that gap in the record

would be remedied by an order remanding the case back to the agency for further development.

*See Butler*, 353 F.3d at 1003; *Simms*, 877 F.2d at 1053.

Remand for further development of the record is unnecessary in this case.  This Court has the power to enter a judgment reversing the Commissioner's decision "with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  And a remand for further proceedings is neither efficient nor required where the record provides sufficient evidence to conclude that the Commissioner would be required to find a claimant disabled as a matter of law.  *See Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001); *Sacilowski v. Saul*, 959 F.3d 431, 441 (1st Cir. 2020); *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999).  In such a case, the court may opt "simply to remand for a calculation of benefits."  *See Rosa*, 168 F.3d at 83.

That remedy is appropriate here.  The record contains ample medical evidence, including findings by Ms. C.'s treating physicians, to indicate that she meets the Paragraph A criteria for Listing 12.15.  She has been exposed "to actual or threatened . . . injury [and] violence."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.15(A)(1); AR 583, 586, 612, 1182, 1851.  She has involuntarily re-experienced her trauma through "intrusive memories, dreams, or flashbacks."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.15(A)(2); AR 334 (report from Dr. Ward documenting "severe anxiety with daily flashbacks"), 1426 (report from Dr. Noorani describing "fear response to cues of her traumatic experience"), 1673 (visit notes from Dr. Noorani noting that Ms. C. "reported flashbacks of being hurt and was very tearful and fearful").  She has demonstrated behaviors aimed at avoiding "external reminders of the event."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.15(A)(3); AR 576 (describing Ms. C.'s reaction to seeing an ex-abuser at a grocery store), 1673 (same), 1426 (Dr. Noorani's assessment that Ms. C. engages in "avoidance behaviors to avoid distress").  Her doctors have noted "[d]isturbance[s] in mood and behavior," as well, including Ms. C.'s irritability, depression, uncontrolled crying, extreme weight loss, and tendency to self-isolate.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.15(A)(4); AR 334, 612, 615,

1182, 1426.  And various medical records document "[i]ncreases in arousal and reactivity," such as Ms. C.'s exaggerated startle response, sleep disturbance, and hypervigilance.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.15(A)(5); AR 334, 1182, 1426.  If this matter were remanded for further proceedings, ALJ Ray would be required as a matter of law to consider this obviously probative evidence, and there does not appear to be contrary evidence in the record that would support rejecting Ms. C.'s doctors' medical findings.  *Warfield*, 134 F. Supp. 3d at 14.

Because the record evidence demonstrates as a matter of law that Ms. C.'s condition meets or equals both the Paragraph A and Paragraph B requirements for Listing 12.15, the Commissioner was required to find her disabled within the meaning of the Social Security Act and "the analysis is over."  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (describing the step three inquiry); *Warfield*, 134 F. Supp. 3d at 18 (quoted language).  There is thus no reason to consider whether the Commissioner's decision below also contained errors related to Ms. C.'s residual functional capacity or ability to engage in other work.

### CONCLUSION AND ORDER

For these reasons, the Court **GRANTS** Ms. C.'s Motion for Judgment of Reversal, **DENIES** the Commissioner's Motion for Judgment of Affirmance, and **REMANDS** this matter to the Social Security Administration with instructions to calculate the benefits due to Ms. C. under the Act.

Dated this February 27, 2023.

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE